MR. MOORE. Good morning. May it please the Court. My name is Aaron Moore. I am here on behalf of the appellant, Freedom Scientific. This is an appeal from an ex parte reexamination out of the Patent Office. THE COURT. Yes, we understand. You may proceed directly to your argument. MR. MOORE. The patent at issue is known as the 707 patent. It's a settled document place marker. And what this patent allows is for a person who is viewing a webpage to mark a particular string or piece of text that appears on the webpage so that they can return to it at a later date. And this has particular utility to Freedom Scientific's customers because Freedom sells software for blind or vision impaired users and it can be difficult or a challenge for such folks to navigate quickly to a part of a webpage. And basically the way the patent operates is it allows a user to create something called a place marker that refers to a particular piece of text and then upon visiting the webpage at a later date, they can call up the place markers associated with that URL and jump to that spot in the webpage. Now the primary reference on the appeal is called McKenty. And McKenty is basically a document for reading HTML. So it's what the reference calls a sonification device or sonification engine. Essentially, it's just about turning the HTML which is the language that webpages are written in into something you can hear. And again, it's directed at the same type of folks as for people who have vision problems and are benefited by being able to have the document read to them. Now that's all it does though. McKenty is not a browser. It doesn't deal with, it simply receives the HTML from somewhere else and converts it into text that can be heard. Now the way McKenty operates, or sound that can be heard, the way McKenty operates is that it takes the HTML and it breaks it into what it calls a parse tree data structure. And that parse tree is what McKenty reads then to the user. And the reason that McKenty is an issue on this appeal is that it does the reading by following what is called a read cursor through the document. And when the user moves to a different document, McKenty will retain the position of that read cursor in the document so that if the user then comes back, the reading can start at the same place where it left off. Now the PTO found that McKenty anticipates six of the claims and that McKenty combination with another reference rendered the other claim obvious. We appeal because we feel there's no evidence that McKenty meets the limitation that's in every claim of storing the URL and that McKenty does not allow one to mark the position in a webpage as provided in the patent and claimed. With respect to the first point, each of the claims that issue requires identifying the URL of the document. In this case, the document is the source HTML document, the document that's on the web. Each claim then requires storing that URL. And again, that URL that's stored is the URL... As I understand it concluded that the URL was stored because the history of the document is stored. So why, it seems to be a fact finding, why isn't that supported by substantial evidence? Because there's only one passage in McKenty that talks about that and it's at column 6, starting at line 46. And it's a paragraph that says, a list of the most recently or begins a list of the most recently requested parsed HTML tree structures and their associated read cursors may be maintained. It goes on to say, by maintaining the read cursor along with each parsed document, when a user switches to another page and the list invention can be found from where it left off. What the passage is saying is that McKenty retains the parsed tree structures. So it receives an HTML document from somewhere else. It turns that into the parsed tree structure, which it reads. If it then receives another HTML document, it turns that into a parsed tree structure. It moves over to read that second parsed tree structure, but it retains the position in the first one. Well, that's what you said. For example, did you submit an expert declaration saying that that's how McKenty should be read to someone of skill in the art? There's simply no disclosure in McKenty about... The answer is no, right? You did not submit a declaration. No. But there's nothing in the reference to indicate that that happens. And in fact, if you look at how it actually operates, you'll see, I think the court will see that it would not retain the URLs. And this is because once McKenty creates the parsed tree structure, it has no need for the URL because it already has the parsed tree structure. So when you navigate back to that first structure, you have everything already that you're going to need to read. But just following up on Judge Dyke's point, it's my understanding that the examiner found that the URL had to be stored in order for McKenty to be functional. And I don't see that that was controverted by any affidavits or any expert testimony that you put in the record. Am I right about that? We did not put in a declaration, but I don't understand that the examiner found that it was required to be functional. I think the examiner found that the reference disclosed that based on this one paragraph. And I don't think that it can fairly be read by anyone to disclose that a URL is being used. And the second reason... How are we supposed to know that? I mean, you know, the trouble is in these cases, you guys come and you make a lawyer argument about really complicated passages in earlier references and things like that. And you ask us to be a fact finder. We're not supposed to be a fact finder. The board is the fact finder. They had evidence determinations by the examiner. You didn't put anything in, and that's a problem for you. The reference doesn't say anything about URLs, and there's... It doesn't mention URLs by name, but the examiner found that implicit in it, and that it did require the storage of URLs. I mean, you know. I guess we don't see any evidence before the board, before the examiner, that there are URLs. So there's no evidence cited by the government that there are URLs in McKinsey. What they're saying is, well, since there is a browser involved separately, there's a separate browser being used to supply McKinsey with this information, that browser has a history. That's a different piece of priority. This is an anticipation rejection. We're not a trial court. The problem is, we're not a trial court. We're not expert on these things. We have to read the record that's made, and you didn't make the record. That's the problem. Well, I think I have to interrupt, because I think we also appreciate that this patent examination process is a procedure between experts. The examiner is the expert, and the it's inadequate to persuade the examiner, putting it in the words of an expert, another expert, an outside person, is not the primary source of information that we need to find. However, this does make place an even heavier burden of persuasion, perhaps on the applicant to overcome the expert determination of the examiner, in this case, supported by the board. In my mind, our concern about how do we decide the technology, a difficult technological question, and an appeal from the office is something, of course, that we're confronted with all the time. I think what we're saying is you didn't make your case. Whether the case would have been made if someone else besides the inventor had sworn to it, I suppose depends on the viewpoint of the decision maker, but you still have to persuade us that your view of the technology, and what the references say, and the difference, and whether the difference, a small difference in my mind, would have been obvious, sufficiently unobvious to warrant the patent, is a pretty difficult burden based on the standard of review that has been imposed on this court by the Supreme Court on appeals for the office. Now, I don't know if that makes your argument even harder, but I do think you have to tell us as forcefully as you can where, from the viewpoint of the examiner's and the board's position, where they were wrong. Well, where they're wrong is that the reference doesn't say URL, and I'm not here alone. I do have opponents who also briefed the issue, and they were unable in their brief to identify anywhere in McKinsey where URLs are being stored. That's not true. They certainly argue that URLs are being stored under McKinsey. Everybody agrees that URL as a term doesn't appear in McKinsey, at least it doesn't appear in this passage. I guess I'm assuming that we all understand what the URL is, and if you look at McKinsey, you can see that based on the way it operates, there's no need to retain the URL. Well, so their argument is, well, it must retain the URL, but it's easy to see that, in my opinion, that if you look at McKinsey, you can see that because it's already obtained the HTML data and turned it into a tree, there's no use for the URL after that point. If you did retain the URL, the issue is that the thing that you have turned into a tree, when you went back to read one that you had moved away from, if you were using the URL, say, to go back out and get the webpage, it likely would have changed, so you would not have identity between the previous thing that you parsed and the webpage that you just pulled down. So, for that reason, you wouldn't, in McKinsey, be retaining the URL because what you've already parsed could have changed compared to what's on the web. If I might move on quickly to the second point, we also don't believe that McKinsey marks any string in the document. I think it's undisputed here that McKinsey only retains the position at which the read cursor stops, and that's in the parsed tree version of the document. That's not in the document, the HTML document, which is the one that the patent says is retrieved and the one in which the marking in the patent is based on. So, at best, McKinsey retains a parsed tree document. It never marks any string in the parsed tree document. The PDO, the government actually acknowledges this. They say that the character data from the parsed HTML document in McKinsey corresponds to the HTML document, and that marking the position of a string in a document that corresponds to the original satisfiable claim. So, the claims don't say marking the position of a string in a document that corresponds to the subject document or marking the position of a string in a document that is a parsed version of the document. The claim says that you have a system that allows the user to mark a position in the document, which is the original document. I don't think there can be any dispute that doesn't happen to McKinsey. They admit that McKinsey only deals with the parsed tree version of the document. Well, assuming that they agree that there's not a basis for rejection on anticipation, you still have to overcome the argument on obviousness. Which argument on obviousness? Only claim six is rejected as obvious. Was there not a rejection by the board on obviousness? No. Was it only anticipation? Claims one through five and seven are alleged to be anticipated, and claim six is alleged to be given up on claim six, or you're not going to argue obviousness? No. Well, claim six would not be an issue if the elements of the... Claim six is a defendant claim. So, if we're correct on our arguments about the elements of the independent claim, about the independent claims not being anticipated, claim six isn't... The combination isn't alleged to fix the defect that would be present in the independent claims. So, claim six would be allowable because the claim from which it depends is allowable. So, your theory is that if we conclude that the anticipation rejection does not lie for the other claims, that that's the end of it, or does it then go back for further examination? I guess we go back for... Let me think about that. No, I think that if we're correct about the elements of the independent claims of Miskin and McEntee, then that would be the end of it. That Cragen reference is not alleged to fix the defects that would be present if we're right on McEntee. Let's hear from the solicitor, and we'll save you rebuttal time. Your Honor, may it please the court. Freedom Scientific has made two basic arguments, and I'd like to respond to those. The first argument that they make is a fact one, that the prior art McEntee reference  does not lie for the other claims. Let me just take you through the passages to really show you clearly what the examiner and the board relied upon to find that indeed the prior art does each store in the URL. I'm in the 707 patent at McEntee. Page A38 of the appendix, column 12. I'm sorry, I have the wrong page. Let me get to the correct page here. McEntee. I was good. Okay, here we go. Page A46, I apologize. Page A46, column 6, which was recited by opposing counsel. He quoted it for you. Column 6, down around lines 46 through 55. It specifically talks about how McEntee, the prior art, can pull up webpages, and the way they pull up those webpages is with a browser, and when they pull up the webpages they record the history of the webpages they visited. If you look earlier on page A45, one page earlier, column 3, lines 34 through 40, you'll see that McEntee expressly states that when it uses a browser it uses a URL to bring up those documents. Therefore, it's our position that McEntee does expressly state that it uses a URL to furthermore, that it records the history of those visited pages. So therefore, it's our position that it does expressly state the URL and that it uses the URL to bring up documents. Further, if you look at what the examiner and the board said, let's just go, for example, to the examiner's answer at page A262, the joint appendix, and A263. On those two pages, the examiner comes right out and he points to those exact provisions that I've pointed to, those passages, and he says, McEntee teaches that such a list provides a history of visited HTML documents commonly implemented in browser software. That's page A262 of the appendix. In other words, he states, the McEntee system uses the history list in a web browser to retrieve documents from the World Wide Web using the uniform resource locators. The browser software of McEntee's system is no different. In column 3, the column that I took you to and showed you, McEntee's teaches, in general, some means of selecting a browser utility must be provided that defines and interfaces for requesting HTML documents by their uniform resource locator URL. So not only did the examiner make this finding that McEntee does teach a URL, does teach a storing URL, but he pointed to the exact passages of McEntee that say that. And on the next page, A263 of the examiner's answer, he says it again. In other words, McEntee would require URLs to be associated with the history list in order to revisit the HTML documents implemented in browser software. As stated in the final action, for example, the backward link function of McEntee would be unable to work otherwise. I think Judge Prost mentioned earlier that there was a finding in the record that McEntee wouldn't operate if it didn't keep a record of these URLs in its history list. That's exactly what the examiner said here. That's the precise finding. So that's the first issue. We disagree that McEntee doesn't expressly show this. We think it does expressly show it. Number two, the second issue, marking a string. Let's look at the claim. Appellant in their brief and here today, one of their main arguments is McEntee doesn't mark a string. It doesn't mark specific text. Well, if you look at the claim on the inside cover of our red brief, claim one, it's a very broad claim, and what it says is a method of marking the position of a string in a document. A position, that's what's marked, the position of the string. So as opposing counsel recited, McEntee indeed is a reader for vision-impaired users. They're sitting there looking at the web. They can't see it, so they have to listen. So McEntee then takes that webpage, it downloads it, it puts it into a readable format, and a reading software reads it, and as it reads it, if it stops at a particular position, because the user might say, stop, I want to go to another webpage, it stops at that spot, it moves to another webpage, it might move to multiple other webpages, but then the user can go back, he can go backwards in the history list, the history list that we just talked about, and he can go back to that exact position that it previously stopped at and pick up reading. In the government's view, the examiner's view and the board's view, that's marking the position of a string in a document exactly as required by the claim. So we think both of these issues, that there's substantial evidence in the record that support the findings by the examiner and the board on those points. Now finally, one other point that opposing counsel raised, he says McEntee's different because McEntee marks a parsed document. It doesn't mark the original document. Well, if you look at the 707 patent, which is their specification, they don't mark the original webpage document either. They download the document, they process that document, that's what gets marked. For example, if you go to page A-20 of the appendix, which is a figure 2, a flowchart on figure 2 of the 707 patent, that's appellant specification, you'll see a flowchart. And that flowchart explains the process in which the 707 patent goes through when it marks its documents. It downloads the document from the webpage, it parses the document just like McEntee, it creates a virtual document just like McEntee, and then it assigns place markers and it saves those place markers. That is exactly what the prior McEntee reference does. So it's our position that when you read claim 1 and it talks about method of marking the position of a string in a document, retrieving the document, downloading it from the web, establishing a cursor location, parsing and identifying the URL and storing the positional value in the URL, that McEntee performs all of those functions and it's crystal clear from the record. And the examiner pointed to the evidence in the record and so did the board. And it's our position that substantial evidence supports those findings and accordingly the board should be affirmed. Maybe not crystal clear, but perhaps clear enough. Okay, your honor. Their position is that it still doesn't show the strings and marking the strings. Right. And I can't see that it does. Well, if you read throughout McEntee, it talks about marking text, it talks about reading text, and a string is a string of characters or, for example, text. A string is a word of art though, is it not well enough understood that if they were talking about strings they would have said so? Well, in the claim it says marking the position of a string in a document. And when we look at McEntee, and we put this in our brief as well, your honor, you'll see search for text, you'll see parsing the text, text into lines on the page, and you'll even see query strings of text in the McEntee reference. And, for example, on page A46 of the joint appendix, column five, let me take you down column five to lines 33 through 36, cursors may be used to represent other positions or as needed, such as when searching the document for a particular text string. That's searching. I understand. But when you search for the text string, and you find it, and you begin to read it, and you stop, you've now marked a position of a string. Well, if you read the rest of the document, your honor, what it says is you can have your text reader reading the text, and when it reads it, if you stop reading at a particular position, it will store that position, because you can come back to the position we're reading left off. And the position that it's stored... Where are you reading from? Well, I was just, first of all, I was reading from the first section there to show you the way it reads. Which line are you on? Well, column five, A46. Column five, A40, page A46, lines 35, particular text string. That's what I'm searching. Correct. Now, let's go further into the Getty at page A46, column six, the next column. The list of most recently requested parsed HTML tree structures. I'm down at column six, lines 46 through 55, which is the same thing that we had read earlier. And what that's talking about there is maintaining the read cursor along with each parsed document. Well, the read cursor is the thing that's reading at a particular spot in the document, which we earlier talked about searching for a text string. Let's say it's searching for my name. It's searching for William Lamarca. It finds it. It begins to read. You can say, stop reading, move to the next document. You've marked a position of text. We want to know where it says that here, not what you're telling us. I understand, Your Honor. And if you look at these two passages together, what you see is in column six, page A46, column six, lines 50 through 55, we're talking about the history of visited documents and maintaining the read cursor along with each parsed document. When a user switches to another page in the list, the invention can continue reading a document from the position at which it stops when last reading that page. Well, when it reads, the read cursor is what marks where you're reading along. That's what's reading. What you're saying is there's no other way to do it other than identifying a string and marking a position in that way. To simplify it, think of it this way. You've got a document on your computer screen, and you have a little cursor. And as the cursor moves, the software is reading those words to you. And if you picked a spot on that page and you searched, for example, for a text string, let's say it was my name, Bill LaMarca. It finds it, and it starts reading. And now you say stop reading. It stops right there. You move to another webpage, and it stores. It remembers the spot where reading was, and you can now go back to the previous page and read at that exact same spot. And in the government's view, the examiner's view, and the board's view, and my view as well, which doesn't really matter, but the examiner's view and the board's view, that's sufficiently marking the position of a string in a document. That's the logic behind the finding, Your Honor. I hope I explained it to you. And finally, the only last point that was mentioned was, I think, Claim 6. Claim 6 is by itself that was rejected in obviousness, and it's correct what opposing counsel has said, that Claim 6, basically the same arguments have been made against Claim 6 because it's a dependent claim. So Claim 6 rises and falls with Claim 1. Claim 1 is the claim that we're really at issue in this case. And Claim 1 was rejected only for anticipation? Correct, Your Honor. Claim, all other claims other than Claim 6, were anticipation over McGinty. Claim 6 has an additional obviousness rejection embedded in it. But you're correct. Anticipation, it all rises and falls with anticipation, and it all rises and falls with Claim 1. And if there's no further questions, I'll take my seat. Thank you. Thank you, Mr. Lamarcker. Mr. Moore? Just one minute's worth, I guess. On the, I just want to address two quick issues. First, counsel said that when he's talking about the URL, he's saying, well, you pull it up with the browser. Well, the browser isn't part of McGinty. The browser is something else. So we would submit that if you're going to involve the browser, we're entitled to a reference that shows the browser, we're entitled then to a 103 rejection. And that's a different thing that we're talking about here. And then secondly, I thought what Mr. Lamarcker said about the strings was sort of illuminating, because he said, well, William Lamarcker is a string. And certainly it is. But that isn't what was happening when he was talking about moving through with the cursor in a document, because you're not marking William Lamarcker. You're just marking a position in the document, not in the string.  Without, I'm sorry? Relying on a string. Relying on the position of the string. How can you mark a position in the document without reference to a string? Because these documents are broken up into trees and they have nodes. So you're essentially marking a node. You're not marking the whole document. You're marking the point on the string, is that right? Or the node? The node. So for example, in the example described in the patent, I think it's electronics or something. So that term is going to appear in a node in the HTML document. It's broken into a tree and it's basically a leap on the tree. And how does that differ from what Council was directing us to in the reference in column six? In the reference? In the reference that we were just talking about. So in McEntee... Sounds just like what's in the reference. Well, there isn't anything that relates to that particular string. It's just the point in the document, wherever you happen to be. It's not allowing the user... How is the point identified if it's not by a string? How is the point identified except by reference to a string? The position. How is the position identified? The position is just the position. You might say... Position, that's an abstract concept. It has to be identified in some way with reference to something. Right. If it's not being identified with reference to a string, how is the position being identified? Well, in my view, that's the point. The position is not with reference to a string. The position is nothing at all. It's the position. In other words, the invention. McEntee doesn't work, is what you're saying. No, McEntee marks a position in the document, but McEntee doesn't mark a string. And certainly McEntee doesn't allow a user to mark a string in the original document, which is what's actually claimed, not a position in the HTML3 version of the document. Okay, we'll figure it out. Thank you. Okay. Thank you, Mr. Moore and Mr. LaMarca. The case is taken into submission. All rise.